## COMMONWEALTH vs. NOEUN SOK.

Middlesex. February 7, 2003. - May 20, 2003.

Present: MARSHALL, C.J., IRELAND, SPINA, COWIN, & SOSMAN, JJ.

*Homicide. Evidence,* Motive, State of mind, Self-defense, Relevancy and materiality, Cross-examination, Bias, Impeachment of credibility. *Practice, Criminal,* Instructions to jury, Capital case. *Self-Defense. Witness,* Bias, Impeachment.

At a murder trial, the judge properly denied the defendant's motion for a required finding of not guilty as to murder by extreme atrocity or cruelty, where the fact that death was inflicted by a single blow did not preclude a finding of extreme atrocity or cruelty, and where a conviction under this theory was supported by several factors set forth in *Commonwealth* v. *Cunneen*, 389 Mass. 216 (1983). [431-432]

At a murder trial, the judge did not err in admitting in evidence a book cover containing certain graffiti on it, found inside the defendant's school locker two days after the victim was stabbed, where the book cover was admissible to show the defendant's inchoate intent to kill a member of a particular gang, of which the victim was a member, when the opportunity arose. [432-433]

At a murder trial in which the theory of defense was that the killing occurred in the heat of passion following a confrontation between two gangs, the judge's ruling precluding the defendant from cross-examining Commonwealth witnesses about the victim and his gang's history of violence as they affected the defendant's state of mind did not violate his rights to reasonable cross-examination, to present a defense, or to a fair trial. [433-434]

At a murder trial, the judge properly excluded questions during cross-examination as to whether certain Commonwealth witnesses had carried weapons in the past. [434]

At a murder trial, the judge erred in totally foreclosing the defendant's attempt to cross-examine three Commonwealth witnesses concerning their current gang membership in order to show their bias; however, where there was considerable evidence impeaching the three witnesses, including a demonstration of their bias and gang membership, the judge's ruling did not create a substantial likelihood of a miscarriage of justice. [434-436]

At a murder trial, the judge properly instructed the jury on all three prongs of malice as they apply to murder by extreme atrocity or cruelty. [437-438]

There was no merit to the contention by a criminal defendant that the scheme for determining whether a murder is extremely atrocious or cruel is fundamentally unfair because it "pushes" the jury to reach such a verdict and does not mandate that the jury weigh the evidence relative to the fac-

tors set forth in *Commonwealth* v. *Cunneen*, 389 Mass. 216 (1983), to determine whether their over-all weight cuts in favor of or against such a verdict or whether the absence of some enumerated factors outweighs the presence of others. [438-439]

At a murder trial, there was no conflict between the judge's instructions to the jury regarding the degree of murder, where the judge instructed the jury to find the defendant guilty of the highest degree of murder that they determined had been proved beyond a reasonable doubt, and otherwise to find him not guilty of murder. [439-440]

INDICTMENT found and returned in the Superior Court Department on February 4, 1999.

The case was tried before *Timothy S. Hillman*, J.

*Carlo A. Obligato*, Committee for Public Counsel Services, for the defendant.

*Loretta M. Lillios*, Assistant District Attorney, for the Commonwealth.

SPINA, J. The defendant, Noeun Sok, was convicted of murder in the first degree on the theory of extreme atrocity or cruelty. On appeal he asserts error in (1) the denial of his motion for a required finding of not guilty as to murder by extreme atrocity or cruelty; (2) various evidentiary rulings; (3) the instructions that permitted the jury to consider the murder weapon as evidence of both malice and extreme atrocity or cruelty; and (4) the absence of an instruction permitting the jury to consider evidence that mitigated against a verdict of extreme atrocity or cruelty or that instructed them to determine that the absence of factors listed in *Commonwealth* v. *Cunneen*, 389 Mass. 216 (1983) (*Cunneen* factors), could weigh against such a verdict; and (5) a conflict between the instruction that informed the jury that they shall determine the degree of murder, and the instruction that directed the jury to return a verdict of the highest degree of guilt that the Commonwealth had proved beyond a reasonable doubt. The defendant also asks us to exercise our power under G. L. c. 278, § 33E, and reduce the conviction to voluntary manslaughter. We affirm, and decline to reduce the conviction or order a new trial.

1. *Facts.*

The jury could have found the following facts. At approximately 3 P.M. on January 12, 1999, the defendant and a

friend, Noeun Phan, both fifteen years old, were walking on Central Street in Lowell, to mail a letter. They were members of the Union Boys Crew (UBC), a local gang.

At the same time and place, but walking toward them from the opposite direction were four older teens, Keoudone Onexaivieng (victim), Shane Downs, German Acevedo, and Edwin Rosa. They were going to Acevedo's house to play video games. The victim and Downs were members of the Tiny Rascal Gang (TRG), a rival to the UBC. Acevedo and Rosa were affiliated with the Platoons, a gang aligned with the TRG.

As the groups neared, the defendant and Phan gave the victim "a real dirty look." Phan bumped into Acevedo, who responded with a push.[1] The victim bent down as if to pick up something that the defendant believed was a rock that the victim was going to throw at him and Phan. The defendant drew a Samurai sword from a sheath hidden under his coat. The sword was approximately thirty inches long, of which the blade was approximately fifteen inches. The victim and his three friends fled. There was no evidence that they had any weapons.

The defendant and Phan pursued them. At first, the group of four fled together, but the victim and Acevedo broke away and the defendant and Phan followed them. As the defendant and Phan closed the gap on the victim, who was trailing Acevedo, Phan yelled, "Get him. Get him." The defendant shouted, "If you want to fuck with me, I'll get you for it." The victim lost ground when he turned into a passageway by a locksmith shop and slipped on some ice. As the victim stopped to cross a street, the defendant caught up to him and thrust the sword with an upward motion into the victim's right lower back, pushing the blade more than six inches upward and toward the center of the victim's torso. The blade pierced the inferior vena cava, the small bowel (in two places), and the inferior mesenteric vein, and nearly passed through the front of the victim's body. Notwithstanding his injuries, the victim continued to run and the defendant continued his pursuit, sword in hand, until the victim collapsed. When the chase ended, the defendant and Phan jumped up and down and "looked kind of happy."

---

[1]The defendant's version had Acevedo initiating the confrontation by punching Phan in the face.

When emergency personnel arrived, the victim was lying in a large pool of blood, bleeding profusely, conscious, and moaning from excruciating pain. He was disoriented and combative toward the emergency medical technicians who were attending to him. He was taken to the University of Massachusetts Medical Center in Worcester where he underwent surgery and received seven and one-half liters of blood, more than 150 per cent of the volume of his own blood. Five hours later he died.

2. *Motion for a Required Finding of Not Guilty.*

The defendant argues that his motion for a required finding of not guilty as to murder by extreme atrocity or cruelty should have been allowed because death was inflicted by only a single blow that did not surpass the cruelty inherent in any killing. See *Commonwealth* v. *Eisen*, 358 Mass. 740, 746 (1971).

"We have delineated a number of factors which a jury can consider in deciding whether a murder was committed with extreme atrocity or cruelty. These include indifference to or taking pleasure in the victim's suffering, consciousness and degree of suffering of the victim, extent of physical injuries, number of blows, manner and force with which delivered, instrument employed, and disproportion between the means needed to cause death and those employed." *Commonwealth* v. *Cunneen, supra* at 227. A conviction under this theory of murder may be supported by a showing of any one or more of the *Cunneen* factors. See *Commonwealth* v. *Patterson*, 432 Mass. 767, 773 (2000). Here, there was evidence of several *Cunneen* factors to support a finding of extreme atrocity or cruelty under the standard set forth in *Commonwealth* v. *Latimore*, 378 Mass. 671, 677 (1979), to be applied when deciding a motion for a required finding of not guilty.

The defendant chased the victim a considerable distance with his sword, yelling at him during the pursuit; he continued the chase even after stabbing the victim, and jumped up and down in celebration, indifferent to the victim's suffering. The victim, still conscious for some considerable period of time, experienced severe pain from his extensive internal injuries. The medical examiner testified that the sword was thrust into the victim's lower back with "significant force in a sustained upward direction into the body," causing extensive internal injuries and

nearly impaling him. See *Commonwealth* v. *Glass*, 401 Mass. 799, 803 (1988) (jury could convict on extreme atrocity or cruelty based on single five-inch deep stab wound where defendant turned knife in victim's body to maximize injury). The sword, capable of impaling someone, had a handle long enough to wield with two hands for maximum thrust. The fact that death was inflicted by a single blow did not preclude a finding of extreme atrocity or cruelty. See *id.* The motion for a required finding of not guilty was correctly denied.

3. *Evidentiary Issues.*

(a) *Evidence of intent to kill.* The judge admitted, as evidence of the defendant's intent to kill, a book cover found inside the defendant's school locker two days after the stabbing. The book cover had graffiti on it stating, "Present Union Boys Crew Roach Killer." The term "roach," as explained by the Commonwealth's gang expert, was a term of disrespect used by members of the UBC toward members of the TRG. The defendant timely objected, and now argues that the evidence was not probative of a specific intent to kill the victim, but rather was a general statement of animosity toward a group of people, and as such constituted inadmissible character evidence, namely, that the defendant was a killer and that he had a general disposition to kill, citing *Commonwealth* v. *Trapp*, 396 Mass. 202, 206 (1985), *S.C.*, 423 Mass. 356, cert. denied, 519 U.S. 1045 (1996). We disagree.

The book cover was admissible to show the defendant's inchoate intent to kill a member of the TRG, of which the victim was a member, when the opportunity arose. The defendant gave a statement to the police in which he admitted that he knew that the victim was a member of the TRG. Where evidence of "the defendant's gang membership was essential to understanding the motivation behind the crime[]," the judge acted within his discretion to admit the book cover. See *Commonwealth* v. *Maldonado*, 429 Mass. 502, 504 (1999). The evidence explained why the defendant would carry a sword under his coat, and the defendant's taunts as he chased the victim. See *Commonwealth* v. *Rivera*, 424 Mass. 266, 267 (1997), cert. denied, 525 U.S. 934 (1998); *Commonwealth* v. *Perez*, 47 Mass. App. Ct. 605, 608 (1999).

The judge mitigated any potential for unfair prejudice by following procedures we approved in *Commonwealth* v. *Maldonado, supra* at 505-507 & n.1. During jury selection the judge questioned prospective jurors about their ability to consider anticipated evidence about gangs solely on the question of motive or intent and not consider it as evidence of bad character or propensity to commit crimes. He satisfied himself that jurors who remained available for service could be impartial in the face of such evidence and follow his limiting instructions. The judge gave forceful limiting instructions as the gang evidence was admitted, and again in his final charge. Evidence about gangs permeated the trial, with the victim, the victim's companions, the defendant and Phan all affiliated with rival gangs. The evidence of the book cover depicting that rivalry in lethal terms was not especially prejudicial. We note that the jury acquitted the defendant of murder in the first degree under the theory of deliberate premeditation, an indication that they remained dispassionate about the evidence and were able to follow the judge's instructions.

There is no merit to the defendant's claim that, absent a showing that the book cover had been created temporally proximate to the stabbing, it should not have been admitted as probative of his state of mind on January 12, 1999. The book cover was found in the defendant's school locker on January 14, 1999, a school that he had been attending regularly. The book cover also had the defendant's moniker, "DK," on it. Regardless of when it was created, because the defendant held the book cover in his hands several times each week, the judge could reasonably conclude that the purpose of its graffiti was constantly to remind the defendant of a matter of importance to him, and therefore probative of his state of mind on January 12, 1999.

(b) *Exclusion of evidence of violence by TRG and the victim.* The defendant argues that, where the theory of defense was that the killing occurred in the heat of passion following a confrontation between the two groups, the judge's ruling that precluded him from cross-examining Commonwealth witnesses about the victim and TRG's history of violence as they affected his state of mind violated his rights to reasonable cross-examination, to present a defense, and to a fair trial.

We have said that, in cases of self-defense, evidence of a victim's violent character may be admissible if the defendant shows that he knew of that violent nature before the incident. See *Commonwealth* v. *Edmonds*, 365 Mass. 496, 502 (1974). We have also said that, in cases of self-defense, a defendant "may introduce evidence of recent, specific instances of the victim's violent conduct, known to the defendant at the time of the homicide." *Commonwealth* v. *Fontes*, 396 Mass. 733, 735 (1986). The judge's rulings about which the defendant complains were consistent with those cases. Assuming, without deciding, that the same principles would apply to this case, in which there was a claim of heat of passion, there was no error.

The defendant was able to present his defense through evidence that had been properly admitted. Statements of the defendant concerning TRG violence known to him were admitted in evidence. The defendant had told the police that the "TRG . . . keep messing with me and my friends all of the time and they have threatened to kill us. On top of that, the TRG . . . just killed a kid a few weeks ago . . . and I wanted to protect me and my friends." There was also evidence that the victim had threatened Phan by letting it be known that he had "a bullet with [Phan's] name on it." The defendant failed to offer any evidence that he knew about any other incidents of TRG violence or violence by the victim before January 12, 1999, about which he proposed to cross-examine witnesses. Without evidence of the defendant's prior knowledge, the evidence sought had no relevance to any issue in the case.

(c) *Exclusion of evidence that Commonwealth witnesses carried weapons in the past.* During cross-examination of Downs the judge properly excluded questions as to whether any of the four had carried weapons before January 12, 1999. There had been no showing that the defendant knew that they had carried weapons in the past. See *Commonwealth* v. *Edmonds, supra.* The judge did not foreclose all inquiry. He held the defendant to proper foundational requirements that the defendant did not satisfy, and without which the evidence in question had no relevance.

(d) *Denial of cross-examination of Commonwealth witnesses as to current gang membership.* The defendant contends that the

judge erred by totally foreclosing his attempt to cross-examine Downs, Acevedo, and Rosa concerning their current gang membership in order to show their bias. See *Commonwealth* v. *Henson*, 394 Mass. 584, 586 (1985).

With respect to Downs,[2] the judge asked counsel how current gang membership could be used to impeach the witness. Counsel responded that it could be used as a "[p]rior inconsistent statement" and to show his "predilection for violence and that he has an assault record." Counsel did not offer bias as a basis for cross-examination of Downs. Having been asked to state his reasons for cross-examining Downs on the question of his current gang membership, the defendant may not raise for the first time on appeal an argument not presented to the trial judge.[3] See Mass. R. Crim. P. 22, 378 Mass. 892 (1979). We review to determine if any error created a substantial likelihood of a miscarriage of justice. *Commonwealth* v. *Lyons*, 426 Mass. 466, 473 n.12 (1998).

The defendant argues that the witnesses may have been inclined to protect themselves and their gang allies, and that Downs may have had special reason to curry favor with the Commonwealth in the event of a probation revocation proceeding based on current gang involvement. See *Davis* v. *Alaska*, 415 U.S. 308 (1974). We agree.

A criminal defendant has the constitutional right to cross-examine a prosecution witness to show bias. See *Commonwealth* v. *Tam Bui*, 419 Mass. 392, 400, cert. denied, 516 U.S. 861 (1995). "If, on the facts, there is a possibility of bias, even a remote one, the judge has no discretion to bar all inquiry into the subject." *Id.* Because the witnesses' gang involvement could have motivated them to testify against the defendant, and because Downs may have felt a need to assist the prosecution should he ever face a probation revocation proceeding, it was error to foreclose all inquiry of current gang involvement.

---

[2]When asked about his current gang membership, Downs claimed the privilege against self-incrimination under the Fifth Amendment to the United States Constitution. The judge did not make his ruling on this basis.

[3]The issue as to Acevedo and Rosa came up generally at a sidebar conference, where the judge said that he would permit inquiry on a proper foundation. The matter did not come up again.

However, there was considerable evidence impeaching the three witnesses, including demonstration of their bias. Defense counsel impeached Downs and Rosa with their prior adjudications of delinquency. See G. L. c. 119, § 60. Counsel cross-examined Downs as to pending charges, and was able to explore any motive Downs may have had to cooperate with the prosecution on that basis. See *Commonwealth* v. *Connor*, 392 Mass. 838, 841 (1984). Counsel also questioned Downs regarding his probation violation and its potential for creating bias. See *Commonwealth* v. *Roberts*, 423 Mass. 17, 20-21 (1996).

The jury in fact heard evidence of the witnesses' current gang memberships. The Commonwealth's gang expert testified that "Shane Downs is a member of the [TRG]"; that "Acevedo . . . . He's Platoon"; and that Rosa, "He's in line more with Platoon . . . ." Moreover, when Downs invoked the privilege against self-incrimination in front of the jury without any follow-up curative instruction from the judge, his testimony was tantamount to an admission that he was still a gang member. Bias based on affiliation with a rival gang was unambiguously demonstrated without further questioning of the gang witnesses on their current gang affiliation.

The judge's ruling did not interfere with the theory of defense, which was that mitigating circumstances were present that would render the killing voluntary manslaughter, and not murder. There was ample evidence of the animosity between the TRG and the UBC, as well as evidence of specific acts of violence by the TRG and of what the TRG was capable of doing, evidence that the defendant relied on for the claim that he acted in the heat of passion.

Finally, the critical evidence surrounding the chase and the killing came from witnesses other than Downs, Acevedo, and Rosa. The defendant admitted that he chased and stabbed the victim; the medical examiner testified concerning the nature of the wound; two disinterested persons testified about the chase and the defendant's cries; and the Commonwealth's gang expert testified about the gang backdrop and the significance of the book cover. The judge's ruling did not create a substantial likelihood of a miscarriage of justice.

4. *Instruction on Extreme Atrocity or Cruelty.*

(a) *The sword as evidence of malice and extreme atrocity or cruelty.* The defendant had requested that the judge not instruct that malice may be inferred from the use of a dangerous weapon because it would "usurp[] the jury's function [to] determine whether or not that weapon, the way it was used, constituted extreme atrocity or cruelty." The judge announced that he would instruct the jury that malice may be inferred from the use of a dangerous weapon. The issue is thus preserved for appellate review. See *Commonwealth* v. *Biancardi,* 421 Mass. 251, 253-254 (1995).

The defendant argues that the contested instruction did "double duty by '. . . subsum[ing]' the one *Cunneen* factor on which the jury most likely relied to reach [their] verdict, namely, the weapon or instrument used" into a single element with malice, and thus relieved the Commonwealth of its burden to prove two elements. We disagree.

The judge properly instructed on all three prongs of malice as they apply to murder by extreme atrocity or cruelty. See *Commonwealth* v. *Judge,* 420 Mass. 433, 442 (1995). The judge's instructions made clear that the element of malice required proof of the defendant's intent. The instruction that malice may be inferred from the intentional use of a dangerous weapon allowed the jury to consider evidence of the defendant's use of the sword, to the extent that it was "capable of causing serious injury or death," as evidence of his intent.

The instruction that permitted the jury to consider the nature of the weapon used, as applied to the issue of extreme atrocity or cruelty, had nothing to do with intent, but "focuse[d] both on the defendant's actions, in terms of the manner and means of inflicting death, and on the resulting effect on the victim, in terms of the extent of physical injury and the degree of suffering endured." *Commonwealth* v. *Judge, supra,* quoting *Commonwealth* v. *Lacy,* 371 Mass. 363, 367 (1976). The judge correctly impressed on the jury that "[e]xtreme cruelty means that the defendant caused the person's death by a *method* that *surpassed* the cruelty inherent in any taking of human life" (emphasis added). See *Commonwealth* v. *McGarty,* 323 Mass. 435, 440 (1948). Unlike the instruction on malice, which

focused the jury's attention on the defendant's intent, manifested by the use of a weapon capable of causing serious injury or death, the instruction on extreme atrocity or cruelty focused the inquiry on the defendant's actions and the victim's injuries, based on the potential of the sword for causing death beyond ordinary means, namely, by extremely cruel or atrocious means.

The sword may indeed have done "double duty." If so, there would have been nothing improper in the jury's consideration of the sword on two elements of the Commonwealth's case. The two instructions did not compress the two elements of murder in the first degree into one. The instructions required the jury to apply a separate and distinct analysis as to each element. There was no error.

(b) *Failure to instruct that absence of* Cunneen *factors, and other evidence, may weigh against a finding of extreme atrocity or cruelty.* The defendant argues that the "scheme for determining whether a murder is extremely atrocious or cruel . . . is fundamentally unfair [because it] push[es] the jury to reach such a verdict . . . and does not mandate that the jury *weigh* the evidence relative to [the *Cunneen*] factors to determine whether their overall weight cuts in favor [of] or against such a verdict or whether the absence of some enumerated factors outweighs the presence of others."

The defendant's argument depends in large part on his claim that " 'the factors underlying [extreme atrocity or cruelty]' are all essentially aggravating factors meant to enhance the penalty." We disagree with this premise. The *Cunneen* factors are not sentence-enhancing factors. They are " 'evidentiary considerations' that guide a jury in determining [whether an element of the crime has been established, that is] whether a murder was committed with extreme atrocity or cruelty." *Commonwealth* v. *Moses*, 436 Mass. 598, 606 (2002).

The judge instructed the jury that the element of murder in the first degree that the Commonwealth had to prove was extreme atrocity or cruelty, which he defined as meaning that "the defendant caused the person's death by a method that surpassed the cruelty inherent in any taking of a human life." He then instructed the jury to consider the *Cunneen* factors on this issue. His instruction was similar to the one approved in

*Commonwealth* v. *Painten*, 429 Mass. 536, 547-548 & n.10 (1999). The focus was on the element of extreme atrocity or cruelty, not the evidentiary factors.

The *Cunneen* factors did not "push" the verdict, as the defendant contends. They "guide[d]" the jury. *Commonwealth* v. *Moses*, *supra*. The judge did not instruct the jury that, if they find one or more of the *Cunneen* factors, then they *must* find the defendant guilty of murder by extreme atrocity or cruelty. He instructed them that they "cannot make a finding of extreme atrocity or cruelty unless it is *based on* one or more of the [*Cunneen*] factors." The instruction was permissive, not directive.

The fact that some of the *Cunneen* factors may overlap, as the defendant points out, is of no consequence. If the jury find that the murder was committed with extreme atrocity or cruelty, and that finding is supported by evidence of just one of the *Cunneen* factors, then the verdict is justified.[4] See *Commonwealth* v. *Patterson*, 432 Mass. 767, 773 (2000).

There is no merit to the defendant's claim that mitigation and extenuating circumstances should be relevant to the issue of extreme atrocity or cruelty. They are not relevant to the issue. To the extent that such concepts were present in the case, they were relevant to the issue of malice, and they were considered by the jury on that issue and the issue of voluntary manslaughter.

5. *Conflict Between Instructions.*

The defendant argues that there was a conflict between the instruction, "the degree of murder shall be found by you, the jury," see G. L. c. 265, § 1, and the instruction that, "You have an obligation to return a verdict of the highest degree of murder that the Commonwealth has proven beyond a reasonable doubt." See *Commonwealth* v. *Dickerson*, 372 Mass. 783, 797 (1977). There is no doubt that the *Dickerson* instruction is correct. The language of G. L. c. 265, § 1, "does not exempt jurors in a trial on an indictment charging murder in the first degree from the basic rules governing the distinctly separate roles of the judge

---

[4]The defendant benefited from the judge's failure to instruct the jury that they need not be unanimous about which *Cunneen* factors provided the basis for the verdict. See *Commonwealth* v. *Hunter*, 427 Mass. 651, 657-658 (1998), and cases cited.

and the jury in all other criminal trials. . . . It does not give them the right to return a verdict contrary to the facts or the law of the case." *Id.* at 812 (Quirico, J., concurring). We have recently rejected as anachronistic and untenable the interpretation of G. L. c. 265, § 1, advanced by the defendant in his appeal, that would vest the jury with the power of nullification. See *Commonwealth* v. *Paulding*, 438 Mass. 1, 10 (2002).

Read thusly, there was no conflict between the instructions, as the jury were instructed to find the defendant guilty of the highest degree of murder that they determined had been proved beyond a reasonable doubt, and otherwise to find him not guilty of murder. There was no error.

6. *General Laws c. 278, § 33E.*

We have reviewed the entire record, the transcript, and the briefs, and conclude that there is no reason to reduce the conviction or order a new trial.

*Judgment affirmed.*